JEWELL RIDGE COAL CORPORATION v. LOCAL NO. 6167, UNITED MINE WORKERS OF AMERICA, et al.

Civil Action No. 73.

District Court, D. Virginia, at Abingdon.

Jan. 25, 1944.

936

See also 3 F.R.D. 251.

George Richardson, Jr., of Bluefield, W. Va., and William A. Stuart, of Abingdon, Va., for plaintiff.

Crampton Harris, of Birmingham, Ala., Frank W. Rogers and Leonard G. Muse, both of Roanoke, Va., and Welly K. Hopkins, of Washington, D. C., for defendants.

Edward R. Burke and John C. Gall, both of Washington, D. C., for Southern Coal Producers Ass'n amicus curiae.

BARKSDALE, District Judge.

### Statement of the Case.

This is a declaratory judgment action instituted by Jewell Ridge Coal Corporation, the owner and operator of two bituminous coal mines in this District, against two locals of the United Mine Workers of America and certain officials and committee members thereof, District No. 28, United Mine Workers of America, and its officers, and International Union, United Mine Workers of America and its president. The two defendant locals of the Union comprise all of the underground mine workers employed by plaintiff, said two locals being within the jurisdiction of said District 28, said District 28 in turn being a component of the International Union, United Mine Workers of America. The complaint alleges, the joint answer of all defendants admits, and the evidence proves, the existence of an actual justiciable controversy between plaintiff and defendants as to the construction of Section 7 of the Fair Labor Standards Act, 29 U.S.C.A. § 207. By pretrial order, it was stipulated that the issues to be now tried in this action are as follows:

"a. What constitutes the working time which makes up the work week of plaintiff's underground employees within the meaning of Section 7 of the Fair Labor Standards Act of 1938, and what amounts, if any, are due and unpaid to such employees under said Section, the determination of such amounts, if any, to be later referred to a special master:

"(1) In reference to 'a' above, the plaintiff contends that such work week does not include that portion of the time spent by its underground employees in being transported or walking to and from their usual working places.

"(2) In reference to 'a' above, the defendants contend that such work week includes all the time from the time such employees are required to report and do report for work at the portal of the mine until they return to the portal at the end of the shift, less the regular lunch period when they are relieved of all duties."

Neither side having demanded a jury, evidence adduced by both sides has been fully heard in open court by the court without a jury, oral argument has been heard, and briefs have been filed on behalf of both sides, and a brief has also been filed by Southern Coal Producers Association [of which plaintiff is a member], whose petition for intervention was denied, but which was permitted to participate as an amicus curiae.

This action having been tried upon the facts by the court without a jury, the court doth hereby find the facts specially and state separately its conclusions of law thereon, and directs the entry of the appropriate judgment, as follows, in conformity with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c:

### Findings of Fact.

Plaintiff, Jewell Ridge Coal Corporation, owns and operates two coal mines within this District, the older one being known as the "Jewell Ridge Mine" and the other being known as the "Jewell Valley Mine". The Jewell Ridge Mine was opened in 1910, and the Jewell Valley Mine in 1936. Both mines having been in operation for a number of years, the coal now being mined is at a considerable distance from the driftmouth or portal of the mines. Jewell Ridge being the older mine, the distances there are naturally greater, and vary from approximately 4,250 feet to 25,460 feet; at Jewell Valley, the distances vary from approximately 4,600 feet to 14,450 feet. Approximately 500 men are employed at each mine. Although there are slight differences, the methods of operating the two mines are substantially the same.

The coal which is mined at these two mines exists in seams, the thickness of which varies in the two mines from 32 to 54 inches. The main tunnels into the mines, from which coal has been extracted, are known as "haulage ways". From these haulage ways, laterals have been driven which are called "cross entries". These cross entries give access to, and form the boundaries of, "rooms", from which all the coal is taken except the pillars that are left to support the roof. Electric railways

are operated for the removal of the coal when mined, and the men are also transported to and from their places of work on these railways. The company has numerous employees for the operation and maintenance of these railways and the electric power systems and the maintenance of safety within the mines, such as motormen and brakemen, trackmen, bratticemen, wiremen, and a bondman. These employees are all called "company men" and are paid at hourly rates. The employees who actually extract the coal from the seams, are known as "machinemen" and "coal loaders". The method is about as follows: Between shifts, the machinemen place their cutting machines at the faces of the seams. Each machineman then makes a cut or kerf, approximately six inches in height, at the bottom of the seam of coal and parallel to the floor, which cut extends across the width of the room or working place and back into the seam to the depth of six or eight feet. The fragments from this cutting, called "bug dust", are first removed by the "coal loader" when he begins his work, by means of a long-handled shovel. The loader then bores holes at the top of the seam of coal to the same depth as the undercut. He then places explosives in these holes and fires them. These explosions dislodge the entire section of coal which has been undercut, pushing it down and outward. The loader, with his pick and shovel, then proceeds to load the coal thus shot down, into empty coal cars placed adjacent to his work place by operators of gathering motors. The coal is then hauled out to the tipple, processed, graded, and ultimately loaded into railway cars for shipment. All coal loaders, and ordinarily, the machinemen, are paid upon a piece-work basis, that is, at an agreed rate for each ton of coal. The hours of labor of these piece-work employees are, however, important, because they are paid a time-and-a-half rate, or more accurately, a rate-and-a-half rate, for coal extracted by them after the expiration of seven hours of labor.

All plaintiff's employees are required to be at their places of work, for the morning shift, at 8 o'clock, A. M. The men come from their homes to the mines in various ways. Some walk, some come in their own cars at their own expense. More than 400 come in trucks and buses operated for that purpose by the plaintiff company and certain individuals, the expense of such transportation being borne by the company. The

employees arrive at the mines at various times, but each in time to board the "man-trip" which is to take him to, or near, his respective place of work. "Man-trips" are trips made by trains of mine cars drawn by electric locomotives for the purpose of transporting the underground workers to or near their respective places of work. Employees leave the trains at the "man-trip stations" which are nearest to their respective places of work, and walk the rest of the way.

Upon arrival at the mines, each underground worker first obtains his lamp from the company's lamp house near the portal, which is an electric light that has been charged while the employee is off duty. Each underground worker carries with him such drinking water as he needs for the day, as well as his lunch.

After securing their lamps, various men do various things before taking the man-trip. Coal loaders, the most numerous class, do nothing, unless they have brought tools out for repair. Some four or five times a month, they bring tools out for repair, and on such occasions they go by the blacksmith shop and obtain their repaired tools. The bondman, wiremen, bratticemen, trackmen, and such machinemen as ride man-trips, get such tools as they may have brought out of the mine from the tool house, and such supplies as they may need for the day, from the supply house, and load them into the tool cars of their man-trips. However, if these men so desire, they have the option to give their orders for supplies to the section foreman, and such supplies will be delivered on their section overnight by the supply crew. Some machinemen use motors, and those who do, get two gallons of oil from the oil house, approximately 50 pounds of machine bits from the blacksmith shop, and such other equipment as may be necessary, and load such supplies and equipment onto their motors. They get their motors out of the yard, switch them to the sand house, where they fill their four sand boxes and oil the motor. They then run their motors to their assigned places of operation in the mine. Motormen and brakemen go through substantially the same process of getting out their motors and oiling and sanding them, as the machinemen do, before proceeding in the motors to their places of work. These preliminary activities require variously from three to ten minutes.

As previously stated, "man-trips" are for the transportation of underground workers to or near their places of work. They are operated by, and at the expense of, the company. At the Jewell Valley Mine, all underground workers use the man-trips to travel from the main portal to their places of work; at Jewell Ridge, approximately 72 men enter the mine at places other than the main portal and catch the man-trips at some man-trip station inside the mine, or walk all the way to their places of work. Their lamps are brought to them by their section foremen. Transportation for employees by man-trips is necessary for the successful operation of the mines. They constitute a benefit to both employer and employees. They benefit the company in promoting safety, orderliness and increased productiveness; they benefit the employees by saving their time and energy, and thus increase their productiveness.

Each man-trip is composed of a train of empty mine cars such as are used to haul coal, drawn by an electric motor or locomotive. The first car after the locomotive, is the tool car, in which is hauled all mining tools and supplies of the men who ride that man-trip. No one is permitted to ride in the tool car. Ordinarily, seven men ride in each of the other cars of the train, never more than eight. Each car is about 12 feet long and seven feet wide inside. The bottom, or lowest part of the car, is 2 feet, 6 inches, wide. Alongside of that area, and rising above it, is a sort of bench approximately 2 feet, 3¾ inches, wide, and above that, rise the outside walls of the car to the height of 11 inches. Men riding in these cars ordinarily sit on the bench, or, where the top is low, in the bottom of the car. The man-trips are scheduled, those going the greatest distances leaving first, and an interval between trains of at least 500 feet is maintained. The movement of the trains is governed by dispatchers, and the speed of the trains is kept within a maximum of six miles per hour as nearly as practicable. Each man-trip is under the supervision of a foreman, who sees to it that safety rules and regulations are complied with. During the course of the man-trips, foremen occasionally give instructions to employees as to the work they are to perform at their working stations. Such instances are rare, as instructions are ordinarily and customarily given at the working place. No work or labor is required of employees while riding on man-trips, and supervision is limited to the enforcement of safety rules and regulations. Those riding on man-trips sit upright where the roof is high enough, but find it necessary to bend over where the roof is low. Riding on man-trips, while definitely not luxurious, is neither painful nor unduly uncomfortable, and is less hazardous than other phases of mining operations. All coal mining operations are relatively hazardous. During 1941, the last year for which statistics are available, there were reported to the United States Bureau of Mines, 47,742 accidents, of which, 1,075 were fatalities. Assuming that 450,000 men were then engaged in coal mining, the reported accidents represent an accident of some character to more than one out of every ten coal miners during that year. In view of these statistics, and the number of men traveling daily on man-trips in plaintiff's mines, the injuries shown by the evidence to have been received by employees in plaintiff's mines on man-trips are surprisingly few in number and extent.

If Section 7(a) of the Fair Labor Standards Act requires inclusion of travel time as work time, many, if not all, of plaintiff's underground employees have not received all the compensation required by the Act.

Both plaintiff's mines, from the very beginning, have always been operated on the "face to face" basis. The "face to face" basis means that hours of labor are computed on the basis of work at the usual working places, and therefore excludes any consideration of travel time spent in reaching the usual working places and returning therefrom. The "face to face" basis is traditional in the bituminous coal mining industry in this country, and has universally been the basis for the determination of hours of labor therein for approximately the past fifty years. In England and Continental Europe, the basis has been "bank to bank", or portal to portal, or some modification thereof.

Plaintiff's employees were first organized and became members of the United Mine Workers of America in 1933 following promulgation of the NIRA Code of Fair Competition for the Bituminous Coal Mining Industry. This NIRA Code of Fair Competition was drawn up for the industry by representatives of the Union

and the Operators, and was approved by the President of the United States. It provided for the "face to face" wage basis by the use of the following language:

" * * * and this means seven hours work at the usual working places for all classes of labor exclusive of the lunch period. * * *"

Basic wage agreements were entered into by the Union and the Operators, as of April 1, 1934 (continued in effect by successive extension agreements from March 31, 1935, until October 1935), as of October 1, 1935, as of April 2, 1937, and as of May 12, 1939. All these agreements were the result of collective bargaining. The last mentioned agreement, as of May 12, 1939, to extend for a period of two years, was made when the Fair Labor Standards Act was nearly a year old and had been in effect for more than six months. Nevertheless, it, as well as the previous wage agreements, provided for the "face to face" wage basis, necessarily excluding all travel time from the work week. Also the last basic wage agreement reached by collective bargaining, dated April 1, 1941, to extend for a period of two years, provided for the "face to face" basis, in the familiar language of the preceding agreements.

Early in 1940 an investigation by the Office of Wage and Hour Administration of the operation of the Monroe Coal Mining Company in Pennsylvania was begun, to determine whether or not that company's operating practices complied with the Fair Labor Standards Act. In the course of that investigation, the investigator raised the question of whether or not underground travel time of employees must be included in the work week under the terms of the Act. After an extended investigation, the investigator made an exhaustive report in which he discussed at length the matter of travel time and stated as his opinion that the "face to face" basis, excluding travel time, was the proper one to be applied in the coal mining industry, but he indicated that if the rule as applied in the Cornucopia Gold Mining Company case were applied, the Monroe Company would owe its underground workers approximately $70,000.

This situation was brought to the attention of Mr. Charles O'Neill, President of the Central Pennsylvania Coal Producers Association and a Director of the Monroe Company. He in turn brought it to the attention of other coal operators and of Mr. John L. Lewis, President of the International Union, United Mine Workers of America. Thereafter, representatives of the coal operators and the United Mine Workers conferred from time to time with representatives of the Office of Wage and Hour Administration. Both the Operators and the Union officials were definitely opposed to any construction of the Fair Labor Standards Act which would require payment for travel time. On July 9, 1940, the members of the Appalachian Joint Conference Negotiating Committee, for the Operators, and Mr. Earl E. Houck, Director of the Legal Department, for the United Mine Workers of America, jointly composed and sent a letter to Col. Philip B. Fleming, Administrator of the Wage and Hour Division, fully setting out their views on the subject. Amongst other things in their letter, they said:

"This method of measuring the working time at the place of work has been the standard provision in the basic wage agreements for almost fifty years, and is the result of collective bargaining in its complete sense. * * *

"The uniform high rates of pay that have always been included in the wage agreement of the mining industry contemplate the employee's working day beginning when he arrives at his usual working place. Hence, travel time was never considered as a part of the agreement or obligation of the employer to pay for in this industry, nor as hours worked by the employees, and this has been the case since the eight-hour day was established in the industry—April 1, 1898.

"It is urged that any ruling requiring such a change in the custom, tradition and contract provision so as to change the work day from 'seven hours' work in the mines at the usual working places' to any new standard for the measurement of time worked, and to the adjustment of wage rates made necessary thereby, would create so much confusion in the bituminous industry as to result in complete chaos, and would probably result in a complete stoppage of work at practically all of the coal mines in the United States. Such a ruling, moreover, would establish such diversity of time actually spent at productive work as between different bituminous coal mines and within each mine

that there would be no basis on which any general wage scales could be predicated, collective bargaining would therefore be rendered impossible throughout this industry, and the very purpose of the Fair Labor Standards Act would be defeated. In such an event, it would make necessary the reassembling of the Appalachian Joint Wage Conference and it would be faced with an issue that would be almost impossible of solution by agreement, resulting in an industrial conflict that could paralyze the nation. This would be a most unhappy result to flow from an act that was passed by the Congress to aid workers in industries that had unreasonably long hours and unreasonably low rates of pay, as contrasted with the short hours and the high rates of pay in the bituminous coal mines. The great amount of money involved in the case of extra payment by the operators or the great changes that would be required in the rates of pay to the miners, should any change in the present contract be necessary by reason of a new standard for the measurement of time worked, is so serious that a negotiated adjustment would seem to be impossible.

"For the foregoing reasons, we believe that your Division should accept the standards of wages and hours of work, and the definition of working time, as set forth in the Appalachian Agreement (which embodies the custom and traditions of the bituminous mining industry), as complying both with the provisions of the Fair Labor Standards Act and of the Interpretive Bulletin No. 13, to the effect that 'reasonable standards agreed upon between the employer and the employee will be accepted for the purposes of the Act.'

"We therefore respectfully request that your Division issue a supplement to Interpretive Bulletin No. 13, stating that the standard of wages and hours of work and definition of working time, set forth in the Appalachian Agreement, entered into on May 12, 1940, between twenty-three district associations of bituminous coal operators comprising the Appalachian coal producing area and the International Union, United Mine Workers of America, and the several district agreements based thereon, conform to and satisfy the requirements of the Wage & Hour Act."

By letter of July 18, 1940, from Col. Fleming, Administrator, to Mr. Houck, Director of the Legal Department of the United Mine Workers of America, Col. Fleming, referring to Mr. Houck's letter of July 9, 1940, just referred to, said in part:

"In view of the circumstances which you describe in your letter, and in view of the special facts which were developed at conferences with representatives of the industry, it is our opinion that the practice of computing working time on a 'face to face' basis in the bituminous coal industry would not be unreasonable."

Promptly thereafter, Col. Fleming issued a public statement on July 27, 1940, in which he said in part:

"In view of the circumstances described by the industry in submitting its inquiry, Colonel Fleming announced that the practice of computing working time on a 'face to face' basis in the bituminous coal mining industry would not be unreasonable. Colonel Fleming explained the term 'face to face' to mean the productive work performed after the miner arrives at his usual working place, excluding the time spent in traveling from the portal or entrance of the mine to the place of work and the time spent in returning from the working place to the portal in the evening."

The Monroe Coal Mining Company case was then closed, and it was thus administratively determined that the provisions of the Fair Labor Standards Act did not require the inclusion of travel time in the work week of the underground employees in the bituminous coal mining industry.

The United Mine Workers Union has never in any way contended that travel time was work time under the Fair Labor Standards Act until the Wage Conference of March, 1943, and only contended for it then as an additional basis for its demand for a general wage increase to all mine workers, both inside and outside the mines. The 1943 demand of the Union, under the heading "Hours of Labor", for travel time, is as follows:

"To conform with the basic and legal requirement for the industry, the maximum hours and working time provisions be amended to establish portal to portal for starting and quitting time for all underground workers."

The succeeding demand, under the heading "Wage Rate Increases", calls for a two

dollar a day flat wage increase "for all classifications of inside and outside day men", and equivalent increases for piece workers, and provides:

"The increased rates include compensation to meet the portal to portal starting and quitting time."

Thus, the 1943 demand of the Union is actually a demand for a flat wage increase to all mine workers, whether or not they spend any time traveling underground to their usual places of work, and not truly a contention that the Fair Labor Standards Act requires inclusion of the actual travel time as work time for those who have actual travel time underground.

### Conclusions of Law.

The crucial question which I now have for determination, as set out in the pre-trial order, briefly stated, is whether or not the time spent by plaintiff's underground employees in being transported or walking from the portals of the mines to and from their usual working places constitutes working time which must be included in the work week of plaintiff's underground employees by reason of the Fair Labor Standards Act of 1938.

The pertinent portions of the Act are as follows:

"Section 7. (a) No employer shall * * * employ any of his employees who is engaged in commerce or in the production of goods for commerce— * * *

"(3) for a work week longer than forty hours * * *, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.A. § 207(a) (3).

"Section 3. (g) 'Employ' includes to suffer or permit to work." 29 U.S.C.A. § 203(g).

It will be readily conceded by all, that travel by employees from the portal to their places of work, and return, is not for the pleasure, relaxation or amusement of the employees, but it is to be carefully noted that the question is not whether it would be fair for the employer to pay employees for this travel time, or whether I think the employees should be paid for travel time; the real question is whether the language of the Act *requires* such payment. The language of the Act certainly does not in definite terms cover the question here presented. So it would seem advisable to look into the legislative history of the Act.

### Legislative History of the Act.

 I can neither find, nor has anything been pointed out to me, in the legislative history of the Fair Labor Standards Act of 1938, which indicates that it was the intent of Congress to make so radical a change in the wage structure in the bituminous coal industry as to require payment for underground travel time. It is idle to say that, because employees in other industries are compensated under the Act for travel time under various and diverse conditions and circumstances, underground employees in the bituminous coal industry under and by virtue of the Act, must be paid for travel time. Circumstances alter cases. Under some circumstances, travel time is work time: under other circumstances it is not. The bituminous coal industry is sui generis. Its problems have been before Congress for many years. It is one of the few industries, for the regulation of which special Acts of Congress have been passed such as the two Guffey Acts. It is a highly competitive industry. Not only is there competition between the individual coal operators: there is competition between the northern operators and the southern operators, and always there is the sharpest kind of competition between the producers of bituminous coal and the producers of other fuels such as oil and gas. These conditions and many others are important factors which must be regarded in making up a wage structure for the bituminous coal industry. And in this industry, the wage structure is of peculiar importance because the cost of labor makes up approximately two-thirds of the cost of the production of coal. Of course, the Fair Labor Standards Act applies to the bituminous coal industry, as it applies to all interstate industry, but in situations not precisely covered by the language of the Act, its legislative history, as well as all the facts and circumstances, should be examined.

The first general regulation of wage and hour standards for private employment was embodied in the National Industrial Recovery Act, 48 Stat. 195. In the Bituminous Coal Code, adopted under the NIRA in 1933, travel time was definitely excluded, and the "face to face" basis was adopted by the following language:

"No employee shall be required or permitted to work more than eight hours in any one day *at the usual working places* \* \* \*." (Italics mine).

Similarly, in the 1934 amendment, it was provided that:

"Seven hours of labor shall constitute a day's work, and this means seven hours' work *at the usual working places for all classes of labor,* exclusive of the lunch period, whether they be paid on the day or the tonnage or other piece-work basis; \* \* \*" (Italics mine).

This Code remained in effect until 1935, when the National Industrial Recovery Act was held unconstitutional.

In 1937, fair labor standards bills were introduced in both Houses of Congress, and extensive committee hearings were held on these bills. Mr. John L. Lewis, President of the United Mine Workers of America, testified at length, and at no time indicated that travel time should be included as work time. On the contrary, he indicated that he did not expect the bill to affect the coal industry. The following excerpts are from his testimony:

"Senator LaFollette. \* \* \* As I understand it, the objective of this bill as outlined in Section 23, one of them is to prevent the board from going in and upsetting collective bargaining agreements or entering the field where collective bargaining is actually functioning in a bona-fide manner, and thereby producing the result of the action of the employer and employee represented by genuine and effective labor organization." (Page 280).

"Mr. Lewis. \* \* \* For instance, frankly I would not want this bill to convey power to a board to order an investigation into all of the wage agreements in the mining industry right now, or to give the board power to decide that the collective-bargaining agreements in the mining industry were not sound, not proper, were confiscatory, or not in harmony with the facts of the industry and order a modification thereof. I think the power of the board should be limited to cases which run below the level of the standards fixed by Congress. I see endless confusion in the adoption of section 5 now. I see a drift toward the complete fixation of wages in all industry by governmental action." (Page 281).

"Senator Holt. Would you favor allowing the board to investigate collective bargaining agreements where the collective bargaining agreement was beyond the wage level?

"Mr. Lewis. No; I see no point in it.

"Senator Holt. If they have a right to investigate collective bargaining agreements below the wage level why should not they have the right to investigate collective bargaining agreements above the wage level?

"Mr. Lewis. Merely because their right of investigation of agreements that were substandard would be for the purpose of ascertaining whether that was so and of modifying them to meet the congressional standards". (Page 297).

Excerpts from "Joint Hearings Before the Committee on Education and Labor, United States Senate, and the Committee on Labor, House of Representatives, June 2-22, 1937."

In its report on an amended bill in the nature of a substitute, the Senate Committee on July 6, 1937, said:

"The right of individual or collective employees to bargain with their employers concerning wages and hours is recognized and encouraged by this bill. It is not intended that this law shall invade the right of employer and employee to fix their own contracts of employment, wherever there can be any real, genuine bargaining between them. It is only those low-wage and long-work hour industrial workers who are the helpless victims of their own bargaining weakness that this bill seeks to assist to obtain a minimum wage." (Senate Report No. 884, 75th Cong.).

During the debates on the bill, numerous statements were made indicating that it was not the intent of Congress to interfere with the process of collective bargaining. The following are of interest:

"Mr. Walsh. Next, does the bill affect collective bargaining agreements already made or hereafter to be made between employer and employee?

"Mr. Black. It does not." (Senate, July 27, 1937. Congressional Record, Vol. 81, p. 7650.)

"Mrs. Norton. \* \* \* It is not the intention of this amendment, or of the bill, to start fixing wages in all industries but only in those in which oppressive wages are being paid to a substantial portion of workers. \* \* \*" (House, December 13, 1937, Congressional Record, Vol. 82, p. 1391.)

"Mr. Randolph. * * * It (the bill) is not concerned with that fortunate majority of the laboring classes whose collective bargaining power is sufficiently potent to insure the preservation of their industrial rights.

"But it is concerned with those millions in industry who are unprotected and unorganized. * * *" (House, December 13, 1937, Congressional Record, Vol. 82, p. 1395: Parenthesis supplied.)

"Mr. Curley. * * *· There is no conflict of jurisdiction under the provisions of this fair standards of labor bill, and the existing labor organizations of this country. The bill concerns only of relieving the paralysis which, at present, shackles misery and poverty to millions of heads of families, who are underpaid and causing a colossal financial loss in purchasing power because of existing deplorable conditions." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7285.)

"Mr. Boileau. * * * What is more, we are preserving for organized labor its right to bargain collectively and it will bargain for a higher wage than that." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7290.)

"Mr. Allen. * * * This bill has a threefold purpose as I see it. First, it eliminates sweat shops— * * * The bill does not affect organized labor, but those 5,000,000 American working men and women who have not yet been benefited by organized labor." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7291).

"Mr. Fitzgerald. * * * I would have you observe that this proposed legislation will not improve the wages and hours of the majority of workers, nor does it attempt to. For I am greatly pleased to say that the majority of workers do not need this legislation because they are receiving a living wage and are not forced to work unreasonable hours." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7310.)

Although the above statements were made at various times while the measure was being amended and revised, and therefore not with respect to the Bill in its final form, they show a continuing intention not to interfere with the processes of collective bargaining.

No such statute was enacted in 1937, and in regard to wage and hour legislation, in

his message delivered on January 3, 1938, the President said:

"We are seeking, of course, only legislation to end starvation wages and intolerable hours; more desirable wages are and should continue to be the product of collective bargaining." (Congressional Record, Vol. 83, p. 9.)

Shortly before the passage of the Fair Labor Standards Act of 1938, Congressman Connery, one of its patrons, said of it:

"The thing to remember about this bill is that it is not designed to be a cure-all for industrial wages. It is merely aimed at wiping out sweatshop conditions and child labor. Those are the two salient features and should be kept in mind." (House, May 23, 1938, Congressional Record, Vol. 83, p. 7322.)

Thus, it seems to me clear that it was neither the intent of Congress nor the desire of the Union, in the enactment of the Fair Labor Standards Act of 1938, to interfere in any way with the wage structure of the bituminous coal industry. A statement made by Major Percy Tetlow, an official of the International Union, United Mine Workers of America, who testified in this case, seems to bear out this conclusion. He said:

"No, the miners' organization has always taken the position that the question of wages, hours and conditions of employment should be governed and controlled by agreements under collective bargaining in the industry more so than by legislation. We have always taken the position that any legislation which will improve standards of working men and women,—to favor it and foster it and support it. Fundamentally, we are opposed to legislation that controls the daily wage and conditions of employment. We think that is a relationship that should exist between employer and employee."

### The Administrative Ruling.

The fact that the precise question here presented has been investigated and ruled upon by the governmental administrative agency charged with the enforcement of the Act, seems to me to be of paramount importance.

The evidence in this case shows beyond question that in July 1940 the Administrator of the Wage and Hour Division, Department of Labor, ruled that travel

time of underground workers in the bituminous coal industry was not work time within the purview of the Fair Labor Standards Act. There is no suggestion that there has been any modification of this ruling. The Administrator was invited by plaintiff to intervene in this action, of which invitation he must have been aware, as his Regional Attorney was present in court throughout the trial and also attended the pretrial conference. I must therefore assume that the Administrator did not wish to retract or modify his ruling of July 1940.

■■ Of course, an administrative ruling does not have the force of law. In one instance, where I was satisfied that an administrative ruling was plainly wrong, I declined to follow it. Magann v. Long's Baggage Transfer Co., D.C., 39 F.Supp. 742. However, as to such rulings, the Supreme Court has said:

"In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involved 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345.

"* * * it has been the settled law that, when uncertainty or ambiguity, such as we have here, is found in a statute, great weight will be given to the contemporaneous construction by department officials, who were called upon to act under the law and carry its provisions into effect * * *." National Lead Co. v. United States, 252 U.S. 140, 145, 40 S.Ct. 237, 239, 64 L.Ed. 496.

See also Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S. Ct. 350, 77 L.Ed. 796; Securities and Exchange Commission v. Associated Gas & Electric Co., 2 Cir., 99 F.2d 795, 798; Butte Miners' Union v. Anaconda Copper Mining Co., 112 Mont. 418, 118 P.2d 148.

Consequently, I have generally followed such rulings. Reliance Storage & Inspection Co., Inc., v. Hubbard, D.C., 50 F.Supp. 1012, 1014.

■ It seems to me that this particular administrative ruling is entitled to even more than the "great weight" to which the

Supreme Court said such rulings were entitled generally, by reason of the thoroughness with which the Administrator went into the question before making his ruling. It appears from the evidence that the question first came to the attention of the coal operators through what was probably a routine investigation of the operating practices of the Monroe Coal Mining Corporation in Pennsylvania, made by a representative of the Wage and Hour Division to determine whether or not this company was complying with the Act. After a thorough investigation, this investigator reported that in his opinion, travel time in the bituminous coal industry should not be considered as work time, but that, as travel time had been counted as work time in metal mining in the consent decree entered in the Cornucopia Gold Mining case, possibly it would be necessary to count travel time as work time in the bituminous coal mining industry. Upon learning of this situation, high officials of the coal operators association took the matter up with the president and high officials of the United Mine Workers of America, who all agreed, apparently without dissent, that the Act did not require the inclusion of travel time as work time, and that the Administrator should so rule. Representatives of the operators and of the Union expressed this view to various representatives of the Wage and Hour Division, and finally to the Administrator, Colonel Fleming himself. Colonel Fleming "indicated that if in this long period of collective bargaining in the mining industry that that (the face-to-face basis) was the basis upon which payment for work was agreed upon, that there wasn't any reason why he should wish to disturb it. He said that he felt that a bona fide arrangement of that kind of history of fifty years, certainly ought not to be disturbed, particularly after the description we had given him of the disturbance that would be occasioned in the industry by any such revoluntionary change in its wage structure." However, Colonel Fleming did not then make a ruling, but referred the representatives of the operators and the Union to the Regional Director of the Office of the Wage and Hour Division in Philadelphia and his attorney. After conferring with these officials, the representatives of the coal operators and the Union wrote and delivered the letter of July 9, 1940, quoted from in my findings of fact, and which is generally referred to

as the "Houck letter". Then, after receiving a report of this conference, Colonel Fleming made and announced the administrative ruling that in the bituminous coal industry, the Fair Labor Standards Act did not require the inclusion of travel time of underground workers as work time.

I do not find anything in this record which satisfies me that this ruling was plainly wrong; in fact, I find nothing which casts doubt upon its correctness. Giving to it the "great weight" to which the Supreme Court has said it is entitled, it is my conclusion to follow and sustain this ruling.

Case of Tennessee &c. v. Muscoda &c.

Defendants principally rely upon the case of Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al., D.C., 40 F.Supp. 4; Id., 5 Cir., 135 F.2d 320, and on rehearing, 5 Cir., 137 F.2d 176. This also was a declaratory judgment action, for the determination of what constituted the work week of underground iron ore miners under the provisions of the Fair Labor Standards Act of 1938. The District Court considered separately whether—

(1) The time spent on the surface in obtaining and returning tools and equipment,

(2) travel time from the portal to and from the usual places of work, and

(3) the lunch period,—

constituted working time within the meaning of the Act, and concluded that (1) the time spent on the surface in obtaining and returning tools and equipment, and (2) travel time from the portal to and from the usual places of work, must, under the Act, be included in the employee's work week, and that (3), the lunch period, did not constitute working time and need not be included in the work week.

On appeal, the Circuit Court (one judge dissenting) affirmed as to (2) and (3), but reversed as to (1).

At the outset, it is interesting to note that the majority of the Circuit Court, especially in the opinion on rehearing, strictly confine their holding to the particular circumstances of that instant case, and that the majority holding was merely a refusal, "because not clearly erroneous, to set aside a finding supported by evidence as to what constituted working time of employees in the particular circumstances." 137 F.2d at page 183. The Court said (137 F.2d at page 183):

"In a supplemental brief, one of the appellants says that the effect of our decision, the plain and definite holding of the majority, is that as a matter of law the time consumed in traveling from the portal of the mine to the face and in returning therefrom to the portal 'must be included in the working time that makes up the work-week of every ore-mining employee within the meaning of Section 7 of the Fair Labor Standards Act'. We did not so hold, and such should not be the effect of our decision.

"We have written in vain if our opinion is to be interpreted as providing a rigid definition of working time, or as upholding the portal-to-portal theory as a matter of law, or as denying the principle that *in close cases it is well to afford the fullest possible scope to agreements among the individuals who are actually affected.* The evidentiary value of such agreements in relation to working time is for the jury or other fact-finding tribunal. We have expounded no rigid definition of working time.

"The Act fails to provide one, and we should not do what was deemed unwise to do by legislation. The Congress probably failed to define working time for the same reason that it refrained from attempting to define the regular rate of pay, namely, 'because the employment relationships to which the Act would apply were so various and unpredictable'.

"Appellants sought by declaratory judgment to obtain a rigid definition of working time favorable to them. They now chide us for laying down such a definition against them. We do not do either; *we merely refused, because not clearly erroneous, to set aside a finding supported by evidence as to what constituted working time of employees in the particular circumstances.* The Act of Congress in this respect differs from the legislation of those mining states that limit work-time in underground mines to eight hours per day, and that include in this reckoning all time spent underground." (Italics mine)

Defendants do not here contend that lunch time is working time. They do contend that working time for the underground employees begins as soon as they are required to and do report at the portal, and continues until they return to the portal at the end of the shift, thus including all the time spent in obtaining lamps, tools

or equipment, and other preparatory activities, as well as travel time.

As to the time spent in preparatory activities, estimated to consume here from three to ten minutes, I agreed with the majority holding in the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, supra, which is there set out as follows at page 323 of 135 F.2d:

"With respect to time spent by employees checking in and out and procuring and returning tools, lamps, and carbide, the case stands differently. It appears that the workers were obliged to furnish their own tools, lamps, and carbide, and were free to exercise their own judgment as to when, where, and how they should procure their equipment. The company merely instructed them as to the equipment needed, and did not attempt further to regulate the matter. The checking system used by appellants required the employees only to deposit a metal disc at the tally house when arriving for work, and to pick it up again at the end of the shift. In addition to the practical difficulties incident to the computation of isolated moments so elusive in character, we think these pursuits should not be computed as work-time, since they fall within the category of duties incident to qualifying the employee to perform his work rather than within the scope of his actual employment."

As to travel time, I do not agree that the majority holding in the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, supra, should be applied here, as contended by counsel for defendants. In the first place, the weight of the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, supra, is considerably lessened by strong dissent of Sibley, Senior Circuit Judge, in which, in part, he said:

"The Act does not define 'work time' or even 'work'. It may apply to each and every industry. What would be work in one industry may not be in another. It seems to me that a man is at work, for the purposes of the Act, when he is doing what he is hired to do. It may involve mental or physical effort, or it may consist in simple presence. It all depends on the contract of hiring. The Act did not intend to upset and nullify the wage contracts of force in the various industries. It simply fixed minimum wages for work done under them, and maximum hours. Of course contracts yield to the Act on these points, but they still control as to the work to be done, and the way it is to be done, and as to the scale of pay if not less than the minimum fixed by the Act. These things are left to bargaining, and especially to collective bargaining under the principles of the National Labor Relations Act, 29 U.S.C.A., § 151 et seq.

"No question is older in such bargaining than the question whether 'travel time' is to be included in 'work time'. The worker has always thought he ought not to lose all of the time necessary to go to and from his place of work; the employer has thought he ought not to pay for time that produces no work results. The dispute has been resolved in various ways in employment contracts for pay estimated by the hour. Plumbers demand and get pay from the time they leave their places of business to go to a job until they return. Railroad trainmen get pay from the time they report for duty, no matter what delay may occur in the starting of the train. Railway trackmen also are paid from the hour of their assembly at the section point, though they may ride their motor car for miles before doing any track work. On the other hand carpenters, masons, and most artisans and laborers are paid for work only after they take up their tools on the job. As to coal and iron ore miners, traditionally they have been paid according to production, but their modern contracts have always included an express agreement as to their work time, and that agreement has excluded from work time the travel time in reaching the coal seam or ore bed, which were agreed to be the place of work. This is true of the collective bargains made by strong unions throughout the Appalachian region, as it is true of the bargains under which the miners in this case have worked. Their work time is agreed to be that spent at the ore bed. The employers' arrangement to get them to that place reliably and safely is primarily for the benefit of the miner and is not work for the employer, according to these agreements. The discomforts and dangers of the trip, as well as the loss of time, are all considered in fixing the rate of pay for the work of extracting the ore, and the pay scales here involved are far above the minimum fixed by the Act. The miner's work is hard and dangerous, but his pay is supposed to compensate for all this. If it would be better to include travel time in work time, it ought to be done by a new bargain in which rates of pay are also reviewed. If the change

is to be by a special statute (some western States have such statutes), it will operate justly in futuro, and not by unexpected penalty, as here.

"There is nothing in the Act to outlaw agreements that travel time in getting to or from the agreed place of work is not work time. This is true though the employer may organize a means of transportation and make rules for its use. The agreements here that work time includes only time at the face of the ore bed are not illegal. Digging out the ore is what the miners agree to do, and for that they are paid. Getting their tools together and riding or walking to the agreed place of work is not, by force of any law, work done for the mine owner. No one, I suppose, would say that if a group of miners who had spent an hour riding to work decided of their own will not to dig any ore and spent another hour riding back, they had done any work for which they should be paid by force of the Act."

However, conceding the correctness of the decision of the majority in the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, it seems to me that this decision is clearly distinguishable from the instant case and not in point here. In deciding the issue as to travel time, the District Court in its conclusions, and the Circuit Court on appeal, relied upon certain controlling considerations.

First, there it appeared that the Administrator of the Wage and Hour Division, United States Department of Labor, had recently ruled that in the metal mining industry, travel time was work time, and furthermore, the Administrator there intervened and made substantially the same contentions as did the several defendants. Here, the situation is precisely the converse. In July, 1940, the Administrator announced his ruling that in the bituminous coal industry, travel time was not necessarily work time under the Act, and there has been no subsequent modification of this ruling. And as has been heretofore mentioned, although plaintiff in its complaint asserted that the Administrator was interested in the construction and application of the Act and invited his timely intervention in this action, the Administrator has neither sought to intervene nor appear as an amicus curiae, although his Regional Attorney was in attendance throughout.

Second, there it did not appear to the satisfaction of the court that by established usage throughout the industry, travel time was uniformly excluded from the work week. It does appear here, beyond any question, that travel time has never been considered as, or included in, work time by anyone in the bituminous coal industry in this country. On the contrary, for certainly the past fifty years, the "face to face" basis has been universally recognized in the bituminous coal industry as the basis for computation of work time.

Third, there, the court concluded that, although it be conceded that recent wage contracts did exclude travel time from the work week, such contracts were not free and uncoerced agreements on the part of the mine workers, but reflected the dictation of the employers and the inability of the employees and their union to obtain recognition of their right, as repeatedly asserted and contended for, to be paid for their underground travel time. Here, we have the word of both the operators and the Union that as to the "face to face" basis, "This method of measuring the working time at the place of work has been the standard provision in the basic wage agreements for almost fifty years, and is the result of collective bargaining in its complete sense." On this point, an excerpt from the brief of counsel for the iron miners in the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, on appeal, is quite interesting (p. 59):

"We are not trying the case of coal miners. We are not experts on coal mining. We do know that there are two great differences between the coal mining situation and the mining of iron ore in Jefferson County. *In coal mining we find a union which has been strong and powerful and which as a union has been engaged in collective bargaining with the coal operators over a long period of years. In our case we find the efforts of the men to organize their union presents a pitiable picture of helplessness against the domination of the mining companies.* In coal mining the men work seven hours per day. At no point in the voluminous record created by the appellants do we find a single ore mining company offering to pay its men on a seven hour day." (Italics mine.)

The record in this case by no means discloses "a pitiable picture of helplessness against the domination of the mining companies". On the contrary, the record here does disclose the picture of the "strong and powerful" union mentioned by counsel, which is able and willing, when it feels aggrieved, even in time of war, to paralyze

the production of bituminous coal in this country by a strike, or, in the euphemistic language of its members, "a work stoppage while awaiting a contract". It is hardly likely that such an union has been coerced by the coal operators into waiving any valuable monetary right to which its members were entitled by law.

Fourth, there the court found that the underground travel was under conditions peculiar to the mining of iron ore which were replete with hazards, highly uncomfortable and requiring physical exertion, due largely to overcrowding of cars, and which were unpleasant and disagreeable because of bad odors, heat and poor ventilation, and were burdensome to those encountering them. Here, although I have not found that the "man-trips" constituted pleasure excursions, I have found no such painful and burdensome conditions as those described in the iron ore mines.

For the reasons set out above, it appears to me that the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case is clearly distinguishable from the instant case, and should not govern, conceding that the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case was correctly decided by the majority.

Other cases involving the question of travel time in other industries under various circumstances and in the light of various statutes have been cited and discussed by counsel for both sides. It does not seem to me that they are sufficiently pertinent to the particular situation here presented, to warrant a discussion of them herein.

### Contemporaneous Construction and Agreements by the Parties.

 The proposition, that contracts made in violation of the Fair Labor Standards Act, or any other valid Act of Congress, are ineffective as against the Act, is too plain to require the citation of authority. And it is equally true that custom and usage, no matter of what long standing, cannot prevail against an Act of Congress. As well stated by counsel for defendants here, acts of Congress are frequently designed to change customs and usages which are deemed unfair, harsh and oppressive. Nor can contemporaneous understandings or constructions of the act by the interested parties alter its plain terms.

 However, in this case, the plain terms of the Act do not cover the precise situation here presented. The question of when travel time is work time, and when it is not, is a question which may require a diversity of answers in diverse situations, as pointed out by Judge Sibley in the Tennessee Coal, Iron & R. Co. et al. v. Muscoda Local No. 123 et al. case, supra, 135 F.2d at page 323 thereof. It is quite true, as urged by defendants' counsel, that that which is plain requires no interpretation and presents no occasion for the use of extrinsic aids to its construction, but I cannot agree with their contention that the plain language of the Fair Labor Standards Act requires inclusion of travel time as work time. It seems to me that the language of the Act relied upon by defendants quoad travel time falls far short of sustaining their contention in plain terms. In such a situation, it seems to me some of the very cases cited and relied upon by defendants' counsel recognize the principle that extrinsic aid should be sought.

"Long-continued practice and the approval of administrative authorities may be persuasive in the interpretation of doubtful provisions of a statute, but cannot alter provisions that are clear and explicit when related to the facts disclosed." Louisville & N., etc., Co. v. United States, 282 U.S. 740, 759, 51 S.Ct. 297, 304, 75 L.Ed. 672.

"The general rule is perfectly well settled that, where a statute is of doubtful meaning and susceptible upon its face of two constructions, the court may look into prior and contemporaneous acts, the reasons which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction. But where the act is clear upon its face, and when standing alone it is fairly susceptible of but one construction, that construction must be given to it." Hamilton v. Rathbone, 175 U.S. 414, 419, 20 S.Ct. 155, 157, 44 L.Ed. 219.

In this case, more than 400 employees travel from their homes to the mines in trucks and buses operated by the company. If they are entitled to pay for the time spent in traveling from the portal of the mine to their usual places of work, might it not also be contended that they are entitled to pay for the time spent in travel from the points where they board the trucks and buses to the mines? If "surrender of freedom of action" be any cri-

terion, as contended by defendants' counsel, do not these employees surrender their "freedom of action" when they become passengers on plaintiff's vehicles?

■ It does therefore seem important to inquire into the customs and usages of the industry, the contracts and agreements made between the parties, and the contemporaneous construction placed upon the Act by the interested parties. The evidence shows beyond question that, in the bituminous coal industry in this country, for the past fifty years, travel time of underground workers has not been considered work time. By the NIRA Code for the bituminous coal industry, travel time was definitely excluded from work time. By the precise terms of all subsequent contracts between plaintiff and defendants, and between employers and employees generally in the bituminous coal industry, travel time has been excluded from work time.

But the defendants contend that the last contract expired March 31, 1943, and that thereafter, in the absence of contract, the Fair Labor Standards Act applied, and that by virtue thereof travel time became work time. Defendants, by an amended answer, have disclaimed any compensation for overtime prior to April 1, 1943. Plaintiff contends that the contract, which by its terms was to expire March 31, 1943, was continued in force by the parties pursuant to directives of governmental agencies. Certainly, the parties continued to operate under the contract of April 1, 1943, to the time of the institution of this action. However, it seems to me that the question of whether or not this contract was continued in force and remained binding upon the parties during this period is neither important nor material. If the Fair Labor Standards Act, from its effective date, required the inclusion of travel time as work time, it did so irrespective of contract, and if there was a contract to the contrary, the contract would be ineffective as against the Act.

■ What does seem to me important and controlling is that by the universal custom and usage of the past fifty years, and by agreement of the parties in every collective bargaining agreement which was ever made, it was universally recognized that in the bituminous coal industry, travel time was not work time. And this is the condition which prevailed when the Fair Labor Standards Act was enacted in 1938, and of which it must be presumed Congress was aware.

"It is now a settled principle of statutory construction that Congress or a legislature, in legislating with regard to an industry or activity, must be regarded as having had in mind the actual conditions to which the act will apply, that is, the needs and usages of such activity." United States v. Turner Turpentine Co., 5 Cir., 111 F.2d 400, 404.

"Usages long established and followed have, to a great extent, the efficacy of law in all countries. They control the construction and qualify and limit the force of positive enactments." Slidell v. Grandjean, 111 U.S. 412, 421, 4 S.Ct. 475, 478, 28 L. Ed. 321.

The contemporaneous construction of the Act by the interested parties in the bituminous coal industry could not possibly appear more clearly nor fully than as set out in the letter of July 9, 1940, written to the Administrator by responsible representatives of the coal operators and the United Mine Workers jointly, and usually referred to as the "Houck letter". In this letter, not only is there no suggestion that by the terms of the Fair Labor Standards Act, travel time must be included in working time; on the contrary, it is positively asserted that any change from the traditional "face to face" basis would "result in complete chaos, and would probably result in a complete stoppage of work at practically all the coal mines in the United States"; and, "moreover", that "the very purpose of the Fair Labor Standards Act would be defeated" by such a change.

This entire letter is so illuminating that I append it in extenso as a footnote hereto.[1]

---

[1] 1617 Pennsylvania Boulevard
Philadelphia, Pennsylvania
July 9, 1940
Col. Philip B. Fleming, Administrator,
Wage and Hour Division,
Department of Labor,
Washington, D. C.
Dear Mr. Administrator:
As a result of certain investigations which have been conducted by the Wage & Hour Division at bituminous coal mines in Pennsylvania, particularly at the Revloc shaft of the Monroe Coal Mining Company, and a conference that has been held by your Supervising Inspector, Mr. Caffey, at Pittsburgh, Pa., with a committee of the Western Pennsylvania Coal Operators' Association, concerning the application of the Fair Labor Standards Act to the bituminous coal mining in-

"Presumably Congress refrained from attempting such a definition because the employment relationships to which the Acts would apply were so various and unpredictable. And that which it was unwise for Congress to do, this Court should not do. *When employer and employees have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial*

dustry, certain questions have arisen that are disturbing to both employers and employees within the industry. These uncertainties have been continuing for some time and are causing much concern to the mine workers and the mine operators, especially with reference to "travel time."

Today, the Negotiating Committee of the Appalachian Wage Conference, namely: Messrs. J. D. A. Morrow, President of Pittsburgh Coal Company; L. T. Putnam of the Raleigh Wyoming Mining Company, Beckley, W. Va.; L. C. Gunter, of the Southern Appalachian Coal Operators' Association, Knoxville, Tenn.; Charles O'Neill, President of the United Eastern Coal Sales Corporation, New York City; C. E. Cowan, Vice President of Monroe Coal Mining Company; Fredrick H. Knight, counsel for Monroe Coal Mining Company; W. L. Robison, President of the Youghiogheny & Ohio Coal Company and Chairman of the Appalachian Wage Conference on the one hand, and Mr. Earl E. Houck, Director of the Legal Department of the United Mine Workers of America, met with Mr. Dorsey, Regional Director, Philadelphia, Pa., and Mr. Gallagher, Regional Counsel, Philadelphia, Pa., at which time these questions were discussed at length, particularly the application of the Act as to the question of hours of work in the bituminous coal industry.

The mine workers and the mine operators present presented their views to representatives of the Wage & Hour Division as to the provisions of the Appalachian Wage Agreement covering maximum hours and working time. We have filed with the Division copy of the Appalachian Wage Agreement, and the entire provision as to maximum hours and working time is included therein. The pertinent language, however, is "Seven hours of labor shall constitute a day's work. The seven-hour day means seven hours' work in the mines at the usual working places for all classes of labor, exclusive of the lunch period, whether they be paid by the day or be paid on the tonnage basis * * *." The Appalachian Wage Agreement is the basic agreement for the bituminous mines in the States of Pennsylvania, Ohio, West Virginia, Virginia, Eastern Kentucky, Southeastern Tennessee and Maryland. In this territory there are several thousand rail shipping mines employing from 300,000 to 325,000 men, and some twenty-three operating districts. Each of the districts work out a local wage agreement covering its own territory, subject, however, to the provision that it must include within it all of the provisions of the Appalachian Agreement. The mines in the Appalachian region produce 70% of the total bituminous coal produced in the United States annually. Also, the Appalachian Agreement is used by the United Mine Workers of America as the basic agreement upon which the district agreements of the remaining 30% of the country is predicated.

The United Mine Workers of America and coal operators of the United States have been negotiating wage agreements for a period of fifty years. The Appalachian Agreement, covering as it does a great number of men and mines, has been worked out over that period of time and covers within its general provisions myriad wage rates, conditions of work, and hours of employment. This agreement, with its twenty-three supplemental agreements, constitutes a whole document. In those conferences, of course, hours of work has been one of the principal matters of consideration during this period of time. Hours of work with wage rates constitute the heart of any such agreement. In this basic industry we have provided for seven-hour days, five-day weeks, thirty-five hours per week, with high rates of pay. The basic inside day rate in the North is $.857 per hour, and in the South it is $.80 per hour. The underground workers are paid on this basis with maximum rates for mobile loading machine operators, approximately $1.09 per hour. In addition, the agreement provides, "work by mine workers paid by hour or day in excess of seven hours in one day, or thirty-five hours in any one week, shall be paid for it at the rate of time and one-half * * *." It is our opinion that these substantive provisions of the agreement are among the highest standards of labor provided in any industry in the United States, both as to hours of working time and as to wages paid. There is full and complete understanding in the industry between employer and employees as to the application of these provisions. This method of measuring the working time at the place of work has been the standard provision in the

*interpretation of the Act which finds no support in its text* * * *." Walling v. A. H. Belo, etc., 316 U.S. 624, 634, 62 S. Ct. 1223, 1229, 86 L.Ed. 1716. (Italics mine).

Conclusions.

For the reasons set out above, my conclusions of law are:

(1) That the Fair Labor Standards Act of 1938 does not require that there be included within the work week of underground workers in plaintiff's mines, either time spent by such employees outside the portal of the mines before entering therein, or time spent in traveling from the portals to their usual places of work and return.

(2) That plaintiff, in computing the work week of its underground employees on the basis of hours of work in the mines at their usual working places, exclusive of the lunch period, and the time spent outside the portals and travel time from the portals to their usual working places and return, as provided in the effective wage agreements and continuations thereof, and

---

basic wage agreements for almost fifty years and is the result of collective bargaining in its complete sense.

There are many reasons why the provision as to working time has been set out as provided by this agreement. The impracticability of measuring time by any other method is inherent in the very nature of mining coal. Coal mines are sometimes very extensive. When they are first opened up, the working places are, of course, close by and near to the opening of the mine. In such cases there is no problem of either transportation of the men to the working places or time consumed in reaching them; but as mines grow older, the working places move farther and farther away from the portal or opening of the mine, and as such conditions develop, it becomes necessary for provision to be made for transportation of the men over long distances to their working places. This is usually provided by what is known in the industry as "man trips." These trips are scheduled to leave the outside or opening of the mine at a certain hour, so that all the employees will reach their working places by the hour at which work regularly begins at the working places throughout the mine, and these trips are also scheduled to leave the inside of the mine when the day's work is done, at the conclusion of the seven-hour period of work at the working places. Among other provisions of the agreement, there is provided a time for starting the day's work and a lunch period, as well as a time for expiration of the work day. There is some variation in this, depending upon local conditions as to the starting and quitting time at the various collieries. The agreement provides for a certain tolerance. In any event, the starting and quitting time are no more than seven hours apart, exclusive of the lunch period.

In the many conferences that have been held over this period of fifty years, naturally all manner of suggestions and proposals for amplification or amendment of the agreement has been made both by the mine workers and the operators.

The uniform high rates of pay that have always been included in the wage agreement of the mining industry contemplate the employee's working day beginning when he arrives at his usual working place. Hence, travel time was never considered as a part of the agreement or obligation of the employer to pay for in this industry, nor as hours worked by the employees, and this has been the case since the eight-hour day was established in the industry—April 1, 1898.

It is urged that any ruling requiring such a change in the custom, tradition, and contract provision so as to change the work day from "seven hours' work in the mines at the usual working places" to any new standard for the measurement of time worked, and to the adjustment of wage rates made necessary thereby, would create so much confusion in the bituminous industry as to result in complete chaos, and would probably result in a complete stoppage of work at practically all of the coal mines in the United States. Such a ruling, moreover, would establish such diversity of time actually spent at productive work as between different bituminous coal mines and within each mine that there would be no basis on which any general wage scales could be predicated, collective bargaining would therefore be rendered impossible throughout this industry, and the very purpose of the Fair Labor Standards Act would be defeated. In such an event, it would make necessary the reassembling of the Appalachian Joint Wage Conference and it would be faced with an issue that would be almost impossible of solution by agreement, resulting in an industrial conflict that could paralyze the nation. This would be a most unhappy result to flow from an act that was passed by the Congress to aid workers in industries that

in paying its underground workers for their services on that basis, has complied with and discharged all its obligations imposed upon it by the Fair Labor Standards Act of 1938.

An order will be entered declaring the rights of the parties in accordance with the above conclusions, and dismissing this action at the costs of the defendants.

For the foregoing reasons, we believe that your Division should accept the standards of wages and hours of work, and the definition of working time, as set forth in the Appalachian Agreement (which embodies the custom and traditions of the bituminous mining industry), as complying both with the provisions of the Fair Labor Standards Act and of Interpretive Bulletin No. 13, to the effect that "reasonable standards agreed upon between the employer and the employee will be accepted for the purposes of the Act."

We therefore respectfully request that your Division issue a supplement to Interpretive Bulletin No. 13, stating that the standard of wages and hours of work, and definition of working time, set forth in the Appalachian Agreement, entered into on May 12, 1940, between twenty-three district associations of bituminous coal operators comprising the Appalachian coal producing area and the International Union, United Mine Workers of America, and the several district agreements based thereon, conform to and satisfy the requirements of the Wage & Hour Act.

Respectfully submitted,

For the United Mine Workers of America:

s. Earl E. Houck
Director of the Legal Department

For the Operators:

s W. L. Robison, Chairman
s Charles O'Neill
s L. T. Putnam
s L. C. Gunter
s J. D. A. Morrow
Appalachian Joint Conference Negotiating Committee.