**LOCAL NO. 6167, UNITED MINE WORKERS OF AMERICA, et al. v. JEWELL RIDGE COAL CORPORATION.**

No. 5246.

Circuit Court of Appeals, Fourth Circuit.

Oct. 6, 1944.

Writ of Certiorari Granted Jan. 2, 1945.

See 65 S.Ct. 434.

Crampton Harris, of Birmingham, Ala. (Welly K. Hopkins, of Washington, D. C., and Frank W. Rogers and Leonard G. Muse, both of Roanoke, Va., on the brief), for appellants.

George Richardson, Jr., of Bluefield, W. Va., and William A. Stuart, of Abingdon, Va. (Penn, Stuart & Phillips, of Abingdon, Va., and Richardson & Kemper, of Bluefield, W. Va., on the brief), for appellee.

John C. Gall, of Washington, D. C. (E. R. Burke, of Washington, D. C., on the brief), for Southern Coal Producers Ass'n, as amicus curiae.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a suit instituted to obtain a declaratory judgment to the effect

that the Fair Labor Standards Act of 1938 does not require that "travel time" from "portal to portal" be included in the "work week" of miners in bituminous coal mines. Plaintiff is the owner and operator of two mines in western Virginia employing around 900 miners. It brought a class action against two local unions of the United Mine Workers of America and certain of their officers and members. An answer filed on behalf of the defendants denied plaintiff's right to the relief asked and by way of counterclaim asked recovery under the Fair Labor Standards Act for additional wages for work done between April 1, 1943 and June 20, 1943. The District Court rendered judgment for plaintiff and the defendants have appealed. The facts are fully stated in the opinion of the District Court. Jewell Ridge Coal Corporation v. Local No. 6167, etc., 53 F.Supp. 935.

In view of the long established custom in the coal industry not to include travel time in the work week, the collective bargaining contracts extending over a long period recognizing the "face to face" basis of pay, the testimony before the committees of Congress, the reason and purpose of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and the probable effects and consequences of construing the act to require travel time in bituminous coal mines to be included in the work week, there is strong reason for thinking, as everyone connected with the matter seems to have thought until recently, that it was not the intent of Congress that the act should be so construed in its application to the coal mining industry. The reasons in support of this conclusion are fully and ably set forth in the opinion of the learned judge below and need not be repeated. They would be convincing, were it not for the decision of the Supreme Court in Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, etc., 321 U.S. 590, 64 S.Ct. 698, 703, which we do not think can be distinguished in principle from the case at bar.

A distinction is attempted on the ground that the travel time involved in the Muscoda case involved travel in an iron mine and the trial judge had found that it was properly included in the work week, whereas the travel time here involved is in a coal mine and the trial judge has found it not properly included. This, however, is a distinction without a difference. The record leaves no doubt that travel to the working face in a coal mine is substantially the same sort of thing as travel to the working face in an iron mine; and, while the Supreme Court in the case before it made reference to the findings below, it is clear from the opinion that, irrespective of the findings, the court was of opinion that travel of the sort here involved should be considered work within the meaning of the statute and included within the work week. The court said in this connection:

"We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others. Those are the rights that Congress has specially legislated to protect. Such a statute must not be interpreted or applied in a narrow, grudging manner. Accordingly we view Sections 7(a), 3(g) and 3(j) of the Act as necessarily indicative of a Congressional intention to guarantee either regular or overtime compensation for all actual work or employment. To hold that an employer may validly compensate his employees for only a fraction of the time consumed in actual labor would be inconsistent with the very purpose and structure of those sections of the Act. It is vital, of course, to determine first the extent of the actual work week. Only after this is done can the minimum wage and maximum hour requirements of the Act be effectively applied. And, in the absence of a contrary legislative expression, we cannot assume that Congress here was referring to work or employment other than as those words are commonly used—as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.

"Viewing the facts of this case as found by both courts below in the light of the foregoing considerations, we are unwilling to conclude that the underground travel in petitioners' iron ore mines cannot be construed as work or employment within the meaning of the Act. The exacting and dangerous conditions in the mine shafts stand as mute, unanswerable proof that the journey from and to the portal involves continuous physical and mental exertion as well as hazards to life and limb. And this compulsory travel occurs entirely on petitioners' property and is at all times under their strict control and supervision.

"Such travel, furthermore, is not primarily undertaken for the convenience of the miners and bears no relation whatever to their needs or to the distance between their homes and the mines. Rather the travel time is spent for the benefit of petitioners and their iron ore mining operations. The extraction of ore from these mines by its very nature necessitates dangerous travel in petitioners' underground shafts in order to reach the working faces, where production actually occurs. Such hazardous travel is thus essential to petitioners' production. It matters not that such travel is in a strict sense a non-productive benefit. Nothing in the statute or in reason demands that every moment of an employee's time devoted to the service of his employer shall be directly productive. Section 3(j) of the Act expressly provides that it is sufficient if an employee is engaged in a process or occupation necessary to production. Hence employees engaged in such necessary but not directly productive activities as watching and guarding a building, waiting for work, and standing by on call have been held to be engaged in work necessary to production and entitled to the benefits of the Act. Iron ore miners traveling underground are no less engaged in a 'process or occupation' necessary to actual production. They do more than 'stand and wait,' Missouri, K. & T. R. Co. v. United States, 231 U.S. 112, 119, 34 S.Ct. 26, 27, 58 L.Ed. 144. Cf. Bountiful Brick Co. v. Giles, 276 U.S. 154, 158, 48 S.Ct. 221, 222, 72 L.Ed. 507, 66 A. L.R. 1402. Theirs is a fossorial activity bearing all the indicia of hard labor."

That the decision of the Court was understood by the Court itself to be based upon the underlying facts of the case, and not merely upon the interpretation which the lower courts had placed upon those facts, is shown by the concurring opinions, which stressed the interpretation made in the findings of the lower courts. If the interpretation of the facts in these findings had been the controlling consideration in the majority opinion, there would, of course, have been no occasion whatever for the concurring opinions. Furthermore, where the facts of two cases are substantially the same, the law should not be applied differently because trial judges have looked at them in a different way. The record shows that travel in an iron mine is the same sort of thing as travel in a coal mine. The findings of the trial courts as

to whether upon the basic facts travel time was part of the work week within the meaning of the statute were mere conclusions involving mixed questions of law and fact; and, the basic facts being the same, an appellate court cannot distinguish cases on the basis of such conclusions. In such case, the difference in conclusions involving mixed questions of law and fact is necessarily attributable to a difference in views as to the law or its application.

Equally vain is the attempt to distinguish the Supreme Court's decision on the ground that no such custom or bargaining agreements existed in the case of the mining of ore as are shown in the case before us. The Supreme Court decided the point on two grounds: (1) That the custom and agreements relied on were not sufficiently shown, and (2) that they were immaterial in any event. After commenting on the failure of the lower court to find "immemorial" custom or collective bargaining agreements and saying that the lower court's findings with regard thereto were not so clearly erroneous as to require that they be disregarded, the Supreme Court went on to say:

"But in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the workweek or not to compensate employees for certain portions of their work. The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it. Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."

And in a note to the passage above quoted, the Court said:

"Congress was not unaware of the effect that collective bargaining contracts might have on overtime pay. It expressly decided to give effect to two kinds of collective agreements, as specified in Section 7(b) (1) and (2) of the Act. Cf. Section 8(c). It thus did not intend that other collective agreements should relieve employers from paying for overtime in excess

of an actual workweek of 40 hours, regardless of the provisions of such contracts."

■ What the majority of the court has thus so clearly said we are not at liberty to ignore. It is no answer that the case might have been decided on the ground that the evidence as to custom and contract was insufficient. The court chose to place its decision on the additional ground that custom and contract were immaterial; and it is settled beyond controversy that in such case the decision is binding authority as to both of the grounds upon which it is based. Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340, 48 S.Ct. 194, 72 L.Ed. 303; United States v. Title Ins. Co., 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110; Union Pac. R. Co. v. Mason City Co., 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134; 14 Am.Jur. 298.

Nor is anything said in the concluding paragraph of the Supreme Court's opinion upon which a distinction can be based. This is not a case "where precisely accurate computation is difficult or impossible", nor is it one of the "borderline cases where the other facts give rise to serious doubts as to whether certain activity or non-activity constitutes work or employment." Cf. dissenting opinion of Judge Sibley in the Muscoda case, 5 Cir., 135 F.2d 320, at page 323. What is involved is just the sort of activity as was held by the Supreme Court to "leave no uncertainty" as to its character as "work".

■ Under the circumstances, there is nothing for us to do but reverse the decision below. If it is thought that the decision of the Supreme Court should be overruled or limited so as not to apply to a case of this character, that is a matter for the Supreme Court and not for us.

The disturbing effect of the decision here will not be so great as it otherwise would, in view of the fact that, by agreement between the miners and operators, the portal to portal system of computing the work week has now been adopted in the industry. An amended answer filed in the cause waives the right to additional wages due under the act prior to April 1, 1943, the date of the expiration of the contract between the union and the operators; and the amount claimed as additional wages between April 1 and June 20, 1943, is only the amount voluntarily awarded the workers in other mines as a result of the settlement arrived at when the "portal to portal" basis was adopted. The mines of plaintiff were excluded from the terms of that settlement, as we understand, so that the right to an adjudication of the questions here involved would not be affected.

For the reasons stated, the judgment appealed from will be reversed and the cause will be remanded for further proceedings not inconsistent herewith.

Reversed.

SOPER, Circuit Judge (dissenting).

If certain statements in the opinion in Tennessee Coal, Iron & R. Co. v. Muscoda Local, 321 U.S. 590, 64 S.Ct. 698, are viewed apart from their setting, a reversal of the judgment in the pending case in favor of the mine operators may perhaps be logically deduced; but a reversal will produce a result so inequitable that we may well inquire whether we should not discard formality and adopt a realistic attitude in resolving the issue, as we are admonished to do in cases of this sort in the opening sentences of that opinion.

In the pending coal mine case, unlike the Tennessee case where conditions in iron ore mines were under consideration, it was found by the District Court upon undisputed evidence that "by the universal custom and usage of the past fifty years, and by agreement of the parties in every collective bargaining agreement that was ever made, it was universally recognized that in the bituminous coal industry, travel time was not work time." [53 F.Supp. 950] In short, the court found that in the coal mining industry the term "workweek" had come to have the definite meaning of time spent at work at the face of the mine exclusive of travel time; and from this finding the conclusion naturally followed that the term should be given this significance in the application of a statute which does not define the term at all.

This conclusion is now said to be erroneous because in the later decision in the Tennessee case, where the District Court had failed to find any such immemorial custom or collective bargaining agreements, the Supreme Court said, (321 U.S. at page 602, 64 S.Ct. at page 705), that "in any event it is immaterial that there may have been a prior custom or contract not to consider certain work within the compass of the workweek." While this language was used with respect to the different conditions then prevailing in the metal mining industry, it is now taken to mean that cus-

tom or contract, no matter how long or how firmly established, must be disregarded in fixing the limits of the work week in all industries.

This line of reasoning produces such an injustice in the pending case that I am loath to believe that it represents a correct interpretation of the statute or the conclusion which the Supreme Court itself would reach if the pending case were before it. In this case we do not have the picture portrayed in the opinions in the earlier suit of miners struggling against difficulties to obtain the best terms they could get and making repeated unsuccessful attempts to be paid in whole or in part for travel time, where in short travel time was not excluded from work time with the miners' free and uncoerced consent, and the District Court consequently found that there was no custom so well established that Congress must have adopted it or had it in mind when it used the term "workweek" in the statute. Nor do we have such a decision as that rendered by the Administrator of the Wage and Hour Division of the United States Department of Labor on March 15, 1941 in respect to the metal mining industry that work time starts when the miner reports for duty at the collar of the mine and ends when he reaches the collar at the end of the shift. See D.C., 40 F.Supp. 4, at pages 7, 8, 10; 5 Cir., 135 F.2d 322, 323, and 321 U.S. 601, 64 S.Ct. 698.

Quite the contrary has been the situation in the coal mining industry. Not only was there a custom of fifty years' standing, repeatedly embodied in successive collective bargaining agreements, but the custom had the affirmative approval of the powerful union known as the United Mine Workers of America which had been eminently successful in representing the miners' interests. The "face to face" basis for the computation of working time has been traditional in the industry. When the Code of Fair Competition under the National Industrial Recovery Act, 48 Stat. 195, was drawn up for the industry by representatives of the operators and of the United Mine Workers and approved by the President of the United States in 1933, it provided that the work day should consist of seven hours' work at the face of the mine. Basic wage agreements for the industry executed by the operators and by the union in 1934, 1935 and 1937 incorporated this provision. Even after the Fair Labor Standards Act passed on June 25, 1938 had become effective in accordance with its terms on October 23, 1938, the same provision was retained in the basic agreement of May 12, 1939 for the period of two years; and it was repeated in a succeeding two year agreement executed on April 1, 1941.

It must not be supposed that this method of computing wages was imposed upon an unwilling union by the superior power of management. It was deemed by both parties to be beneficial to their respective interests as a practical solution of the perplexing questions which would otherwise arise in applying a general wage agreement to a large number of mines in which the travel time necessarily varied on account of diverse physical conditions. This was strikingly shown in 1940 in the course of an investigation of the industry by the Office of Wage and Hour Administration when the representatives of the operators and the representatives of the union on July 9, 1940 united in a letter urging the administration to recognize the traditional contract provision as conforming to the statute. They pointed out that the wage agreements in effect afforded "the highest standards of labor provided in any industry in the United States both as to hours of working time and wages paid"; and they expressed the opinion that the adoption of the "portal to portal" system "would create so much confusion in the bituminous coal industry as to result in complete chaos". The administration acceded to this view and on July 18, 1940 gave out the opinion that "the practice of computing working time on a face to face basis in the bituminous coal industry would not be unreasonable." It was under this state of affairs that the two year agreement of April 1, 1941 was executed.

It was not until March, 1943, during the negotiations for a new contract to take effect April 1, 1943, that the union suggested that in order to conform with the basic and legal requirements for the industry the maximum hours and working time provisions of the contract should be so phrased as to establish portal to portal for starting and quitting time for all underground workers. But even then it was obvious that the portal to portal basis was proposed in order to justify a flat $2 a day wage increase for all workers because the increase was demanded for all classifications of outside as well as inside day men.

The negotiations were not successful although prolonged conferences were held in an effort to reach an agreement and the dispute was referred to the War Labor Board. There were strikes which resulted in the seizure of the mines by the federal government and intermittent work periods during which the industry operated under the conditions specified in the 1941 agreement. Finally the Secretary of the Interior, representing the government, and John L. Lewis, representing the miners, reached an agreement on November 3, 1943 which included the portal to portal method of measuring work time. Subsequently the greater part of the industry yielded and entered into agreements on the lines of the Ickes-Lewis agreement.

This change of front on the part of the miners for bargaining purposes, when making an agreement for future operations, could not affect the condition which formerly existed in the industry or transform into work time that which was not work time in the generally accepted meaning of the term that had prevailed in the industry for a long time when the statute was passed and that continued to prevail with administrative sanction for five years after its enactment. The statute could not have one meaning in the earlier and another meaning in the later period; and the Mining Company was justified in resisting in this suit the application of the portal to portal method of computation for work done by the miners even after the 1941 agreement had expired.

It seems a mistake to suppose that under no circumstances can custom or agreement throw any light on the meaning of the Act in its bearing upon an industry. The language of the Supreme Court in the Tennessee case should not be given this sweeping significance as the decisions of the courts tend to show. For example, it was held in Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682, that in the statutory sense the regular rate of pay for any particular week is the quotient of the amount paid per week divided by the number of hours worked in that week, and that overtime must be calculated on this basis, and that unless this is done, it is not sufficient that the wages actually paid exceed the statutory minimum; but, on the other hand, it was held in Walling v. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716, that an employer could continue to pay his employees the same week-

ly salaries without violating the Act because he rearranged the basis of compensation by an agreement which provided for a basic rate of pay per hour for the maximum hours fixed by the Act and one and a half times that rate per hour for overtime together with a guarantee that the employee should receive each week for regular time and overtime not less than a stipulated amount. In view of these decisions, it is obvious that the legality of rate of pay may depend upon an agreement of the parties.

It is suggested in mitigation of the harsh effect of a decision adverse to the Mining Company that the amount claimed by the miners in this case has been limited, by amendment of the counterclaim, to the period beginning April 1, 1943 and ending June 20, 1943. Indeed it is assumed in the briefs that each miner's claim is limited to the sum of $40 and that the total sum involved is approximately $40,000. These statements cannot be verified in the record. The amendment to the counterclaim is not limited to the period ending June 20, 1943 but contains merely the assertion that the miners will not further assert their claims to travel time prior to March 31, 1943. The end of the period for which the claim is made is not stated; nor is the amount of the claim defined. The assumed limitation of the period to June 20, 1943 and to the sum of $40 per miner seems to be based on the terms of agreements entered into between the union and other mining corporations; but so far as the record discloses, the Jewell Ridge Coal Corporation has never entered into a new agreement or paid for travel time. If a claim is asserted for the full amount due under the Act, as now interpreted by the miners, a very much larger sum than $40,000 will be involved in this controversy.

Moreover, the decision may be of grave importance in its application to other mine owners who have not dealt with the union or have not signed wage agreements. If the new interpretation of work time is applied to them over the period that has elapsed since the passage of the Act, subject only to local statutes of limitations, and double payment is exacted under the penal sections of the Act, it may be that the mine owners will be subject to losses of huge amounts. Indeed the decision might prove even more sweeping in its effect for it might invalidate the compromise provisions respecting pay for travel time and

liquidated damages that form part of contracts between the mine owners and the union in a large part of the industry. If portal to portal pay is required under the Act as a matter of law, such settlements are not binding if the amount paid is less than the actual wages due under the Act; and the mine owners would become liable not only to make up the deficiency but to pay an equal amount in addition as liquidated damages. Overnight Motor Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. See also, Guess v. Montague, 4 Cir., 140 F.2d 500; Fleming v. Warshawsky & Co., 7 Cir., 123 F.2d 622; Johnson v. Dierks Lumber & Coal Co., 8 Cir., 130 F.2d 115; Rigopoulos v. Kervan, 2 Cir., 140 F.2d 506; Birbalas v. Cuneo Printing Industries, Inc., 7 Cir., 140 F.2d 826.

These considerations give force to the conclusion that Congress could not have intended to compel mine owners to pay large increases in wages over and above those specified in prevailing agreements, and also to inflict upon the mine owners additional sums in the nature of a penalty by giving to the term "work week", as used in the statute, a significance contrary to that which by voluntary agreement and by long continued custom had prevailed in the industry.