WALLING, Administrator of Wage and Hour Division, U. S. Dept. of Labor, v. CLINCH-FIELD COAL CORPORATION.

Civil Action No. 70.

District Court, W. D. Virginia, at Abingdon.

Feb. 4, 1946.

Lemuel H. Davis, Regional Atty., William R. Allcott, Associate Atty., and James B. Leist, Associate Atty., all of Richmond, Va. (Douglas B. Maggs, Sol. of Labor, William S. Tyson, Acting Sol. of Labor, Archibald Cox, Associate Sol., and Jeter S. Ray, Asst. Sol., United States Department of Labor, all of Washington, D. C., on the brief), for plaintiff.

William A. Stuart (of Penn, Stuart & Phillips), of Abingdon, Va., and A. G. Lively (of Burns & Lively), of Lebanon, Va., for defendant.

BARKSDALE, District Judge.

Pursuant to the provisions of Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A. following section 723c, the Court sets out its findings of fact and conclusions of law as follows:

### Statement of the Case.

On March 29, 1943, this action was instituted by L. Metcalfe Walling, Administrator of the Wage and Hour Division, United States Department of Labor, against the defendant, Clinchfield Coal Corporation, a Virginia corporation having its principal office at Dante, Russell County, Virginia, within the jurisdiction of this Court, for the purpose of obtaining an injunction against the defendant, enjoining it from violating certain provisions of Section 15 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., hereinafter called the "Act." Plaintiff alleged that defendant had violated the provisions of the Act with reference to maximum hours of work and the keeping of records, and that therefore he was entitled to an injunction under Section 17 of the Act.

On April 16, 1943, defendant filed its written motion for a bill of particulars. Although the complaint is in the most general terms, containing no allegations of spe-

cific violations of the Act, plaintiff vigorously opposed defendant's motion for a bill of particulars. Oral argument upon the motion was heard by the Court, and written memoranda of argument and authorities were filed by both plaintiff and defendant and considered by the court.

On July 20, 1943, the Court entered an order requiring plaintiff to file a bill of particulars, and pursuant to this order plaintiff filed his bill of particulars on October 6, 1943.

Thereafter, on January 11, 1944, defendant filed its answer, admitting plaintiff's jurisdictional allegations, but denying any violations of the Act and alleging that, if any violations occurred, they had been inadvertent, that certainly no violations were presently occurring, nor would any violations occur thereafter, and that therefore no injunction should issue.

Depositions were taken on behalf of the plaintiff, and a pretrial conference was held at Roanoke on June 16, 1944. Thereafter, evidence on behalf of both plaintiff and defendant was heard in open court at Abingdon, beginning October 9, 1944, and concluding October 17, 1944, leave being granted to both sides to file briefs.

On January 16, 1945, plaintiff filed his brief, on August 3, 1945, defendant's brief was filed, and on September 1, 1945, plaintiff filed his reply brief.

### Preliminary Facts.

The defendant, a Virginia corporation having its office and principal place of business within this District, is, and was at all times mentioned in the complaint, engaged in the mining, sale and distribution of bituminous coal. Defendant operated at Clinchco, three mines (Nos. 7, 8, and 9), and at Dante, three mines (Nos. 2, 3, and 52), and in all its operations employed approximately, and usually in excess of, two thousand men. A substantial quantity of the coal produced by these employees was produced for, sold and transported in interstate commerce, the coverage of the Act not being denied by defendant. In the operation of its coal mines, defendant followed the methods of mining and shipping prevalent in that section of Virginia.

On October 21, 1938, the Administrator of the Wage and Hour Division, United States Department of Labor, pursuant to the authority conferred upon him by Section 11(c) of the Act, duly issued and promulgated regulations prescribing the records of persons employed and of wages, hours and other conditions and practices of employment, to be kept by employers subject to the Act, which said regulations and amendments thereto were published in the Federal Register and are known as Title 29, Chapter V, Code of Federal Regulations, Part 516.

### Coal Loaders.

To support his allegations of violations of the Act, plaintiff relies principally upon the practices with reference to certain coal loaders. From the evidence, I find the facts in this connection to be as follows:

Coal loaders are the men who actually dig out the coal from the seam and load it into mine cars after the seam has been undercut by machinemen and the coal dislodged or shot down with explosives by the drillers and shooters. Coal loaders are, and have been from time immemorial, pieceworkers, i. e., they are paid a certain amount per ton of coal gotten out and loaded upon mine cars by each coal loader. Prior to the effective date of the Act, the hours a coal loader worked had no relation to his compensation whatever, because he worked when he pleased and quit when he pleased and was compensated upon the basis of tonnage produced. So their hours of labor still have no bearing on their compensation except in the case of overtime. Under the provisions of the Act, in the case of overtime, a coal loader would be entitled to time-and-a-half (or more accurately, tonnage-rate-and-a-half) for all coal gotten out by him during the hours worked in excess of the maximum number of hours prescribed by the Act. For instance, if the maximum number of hours prescribed by the Act for a certain week was forty-four, and the coal loader worked during that week fifty hours, for such coal as he produced during the six hours of overtime he would be entitled to compensation at his regular rate plus one-half thereof for each ton produced during the six hours of overtime. During the years covered by plaintiff's bill of particulars, there were more coal loaders available to defendant than it needed. Defendant was, and had been, operating its mines at a financial loss. Therefore, at and before the effective date of the Act, defendant's chief executives determined upon and announced as their policy that employees would not be asked, or permitted, to work hours in excess of the maximum work week prescribed by the Act, for the obvious reason that to permit its em-

ployees to work overtime would increase the costs of operation. One of the purposes of the Act was to spread employment among more people, and defendant had no incentive to work its employees overtime since at that time the supply of labor was abundant. Defendant, by instructions to its supervisory employees and by placards posted at conspicuous places, made it quite clear that overtime would not be permitted except in cases of emergency. Foremen who permitted coal loaders to work overtime, resulting in premium payments to the coal loaders, were required by the company to pay the premium pay themselves as a penalty for permitting the overtime. All coal loaders were required to make out, and turn in to their foremen, daily time slips showing the number of hours worked by them, and they were instructed by their foremen that in each week, when they had worked the maximum number of hours provided by the Act, they would not be permitted to work any more shifts during that week.

However, certain coal loaders perceived that if they did in fact work overtime hours and thereby produced more coal, but falsely reported that they had worked only the maximum number of hours prescribed by the Act at that time, they would get more pay, even though they did not get the premium pay of time-and-a-half, or rate-and-a-half, prescribed by the Act. For instance, if a coal loader, instead of working forty-four hours, the maximum work week prescribed at that time, in fact worked fifty hours, under the Act he would be entitled to time-and-a-half, or rate-and-a-half, for the coal produced the six hours of overtime. However, in defendant's mines, he would not be allowed by his foreman to work over forty-four hours, if the foreman knew it. But certain coal loaders found that they could report forty-four hours and actually work fifty hours, which would result in their being paid at the regular rate for the additional coal produced during the six hours of overtime, which of course, even at straight time, would aggregate more pay than if they only worked forty-four hours. Therefore, in order to increase their earnings, certain coal loaders followed exactly that practice, which, of course, resulted in violations of the Act. However, I do not find that this was a widespread practice. On the contrary, it appears to have been followed in only two of defendant's six mines, and in them, by only a rel-

atively very small number of coal loaders. This practice was without the sanction of the foremen, and was in fact unknown to them, the scheme having been devised by certain coal loaders who desired to increase their weekly earnings and who were careful not to divulge their scheme to anyone in authority. This practice terminated on or before November 3, 1943, when defendant's mines began to be operated on the "portal-to-portal" basis, and defendant knew nothing of such practice until long after the institution of this suit. There is no incentive for a coal loader, under the "portal-to-portal" system, to report less time than he actually worked, and there is no likelihood of a return of this practice.

The evidence of those witnesses who testified that they, as coal loaders, worked longer hours than they reported, is vague and indefinite in that they kept no record of the hours which they say they actually worked, and on the witness stand, they undertook to approximate or estimate on an average the number of hours they worked in excess of the hours reported. I have very grave doubt that such testimony would be sufficient as a basis for a claim for money damages, even if such witnesses should be permitted to contradict, for their own benefit, their own wilfully falsified time reports. However, their aggregate testimony does convince me that a relatively few coal loaders did work overtime, and as they admittedly were not compensated on an overtime basis, such overtime work and the failure of the company to record it and pay for it, would constitute violations of the Act. However, I further find that such violations were inadvertent and unknown to the company and not the result of culpable negligence on its part.

### Miscellaneous Violations.

Most of plaintiff's testimony was in regard to the company's violations of the Act with respect to the coal loaders' hours of work, but in addition, there was testimony which showed certain miscellaneous violations of the Act during the period in controversy:

In Mine No. 2, for a time, certain drillers and shooters were permitted to work on a "split shift," doing the drilling and shooting for the night shift of loaders, then taking a rest period while the night loaders worked, then doing the drilling and shooting for the day shift, after which they themselves quit. They did this work under a contract that

they would be paid at the rate of one dollar per hour for ten hours, each shift. Plaintiff contends that the hours of the rest period between the two parts of the split shift must be considered as hours of work. I do not so find, because the testimony convinces me that during such rest periods the employees were free to leave the mines, go home, or do anything they pleased. However, this practice did result in violations of the Act, because the hours of labor were not accurately kept and recorded, each man being paid for ten hours per shift regardless of the number of hours actually worked.

This practice of having a contract for this work, terminated some time before the close of 1942, and the split shift practice terminated entirely in May 1943.

In Mine 52, certain machine-runners, drillers and shooters proposed to the mine management that they form a pool and each be paid an equal share of their joint earnings, and this scheme was adopted before the effective date of the Act. When the Act became effective, the hours of work were not accurately reported, but hours were reported which would produce a particular amount of agreed compensation. This practice constituted a violation of the Act. However, it terminated in November, 1943.

It was the practice in Mine No. 52 for gathering-motor-crews to pull the section man-trips in that mine without receiving pay therefor. This required about fifteen minutes for a trip. This was not only a violation of the Act, but it was contrary to the universal practice under the "face-to-face" system of operation. It seems to have been an unique practice, at this particular mine, which had grown up long before the effective date of the Act and without the knowledge of defendant's general management. Its continuance after the effective date of the Act, was an inadvertence, and when defendant's management learned of it, immediate steps were taken to terminate the practice and compensate the employees involved.

Plaintiff contends that certain tram operators were entitled to "make-ready" time. This was not true under the "face-to-face" system which prevailed in all bituminous coal mines during the period in controversy. Such time would be compensable under the "portal-to-portal" system. However, I make no findings of fact in this connection, for the reason that during the trial I ruled that the question of whether plaintiff was entitled to an injunction for failure of defendant to compensate its employees on a "portal-to-portal" basis prior to the decision in the Jewell Ridge case, was not presented to the Court for decision by the pleadings (Transcript, pp. 596–600). Pursuant to this ruling, all evidence on this question was stricken out.

### Foremen.

Since November 6, 1940, defendant's mine foremen, assistant mine foremen, night foremen, and general tipple foreman, were employees:

(a) whose primary duties consisted of the management of customarily recognized departments or subdivisions of defendant's operation, and

(b) who customarily and regularly directed the work of other employees therein, and

(c) who had the authority to hire or fire other employees, or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or other change of status of other employees would be given particular weight, and

(d) who customarily and regularly exercised discretionary powers, and

(e) who were compensated for their services on a guaranteed salary basis of not less than thirty dollars per week, and at additional compensation for work in addition to a minimum number of shifts (exclusive of board, lodging or other facilities), and

(f) whose hours of work of the same nature as that performed by nonexempt employees did not exceed twenty percentum of the number of hours worked in the work week by the nonexempt employees under their direction.

### Other Classifications of Workmen.

As to the following classifications of employees of defendant, I find no evidence whatever of violations of the Act:

(1) accounting department
(2) stores department
(3) trackmen
(4) timbermen
(5) repairmen
(6) tipplemen
(7) bondmen
(8) wiremen
(9) bratticemen
(10) water-bailers
(11) trappers

(12) substation operators
(13) slatemen
(14) carpenters
(15) blacksmiths
(16) filter plant and weighmen
(17) painters
(18) linemen
(19) armature winders
(20) timber inspectors
(21) truck drivers
(22) laborers
(23) electric repairmen
(24) car droppers
(25) sand dryers
(26) operators of special equipment
(27) slate pickers
(28) car repairmen.

There is the evidence of one witness, Robert Mays, a pumpman, as to violations of the Act in connection with his employment. I do not find his evidence satisfactory. Consequently, I do not find as a fact that any violations of the Act occurred amongst the pumpmen.

### General Findings.

Defendant has at all times honestly endeavored to comply with the Act. Before the Act was enacted into law, and thereafter, defendant's president held numerous conferences with the principal operating officials, and it was agreed by the management that the provisions of the Act must be strictly complied with. Subordinate supervisory employees were so informed, as were the employees generally. From and after the effective date of the Act, defendant took such steps as seemed necessary to comply with the Act. The methods adopted by defendant for compliance with the Act were reasonable.

In 1941, John H. Hutson made an inspection of the defendant's operations for plaintiff. At the conclusion thereof, on September 8, 1941, he had a conference with defendant's officials and advised them that the Act was being violated in that certain coal loaders in their time reports were not including as work time, time spent at the face waiting for cars. Hutson advised defendant's officials of no other violations. Promptly thereafter, defendant diligently and thoroughly investigated the violations reported by Hutson and was unable to discover any such violating. Thereafter no complaints were made to defendant that the Act was being violated, by either plaintiff or his agents, by any of its employees, or by anyone else, until plaintiff's inspector, James V. Anderson, made an inspection of defendant's operations beginning in November 1942. This inspection was made upon the complaint of one Polikoff, an organizer of the United Mine Workers of America, who, with others, was then undertaking to organize defendant's employees for this Union. Neither the United Mine Workers, nor any other Union, was at that time, or now, bargaining agent for defendant's employees. Polikoff and other organizers of the United Mine Workers assisted Anderson in his inspection. Anderson left defendant's mines before completing his investigation, in December 1942, when a strike took place. Although he had been requested by defendant to advise it of any instances he might find in which the Act was not being complied with, he left without making any report whatever to defendant's management. He testified that he gave defendant no information because he had been instructed not to discuss his findings with company officials where there was evidence of wilful violations or evidence of falsification of records, and that he found what he thought to be such evidence in this instance. From the evidence which I have heard relating to conditions disclosed by his inspection, I find no evidence of wilful violations of the Act by defendant or any evidence of falsification of records, with the exception of the falsification by certain coal loaders of their own time slips for their own benefit.

Although the evidence in this case does disclose some violations of the Act, I find that generally they have been the result of inadvertence on the part of defendant. Certainly, defendant has not been contumacious. There has never been any concerted plan on the part of defendant to violate the Act: on the contrary, defendant has made a bona fide effort to comply with its provisions. In any event, all violations disclosed by the evidence terminated on or before November 3, 1943, when defendant, by agreement with Secretary Ickes, began to operate its mines under the "portal-to-portal" system, and has so continued to operate. At that time, and thereafter until the final determination of the Jewell Ridge case, Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America, etc., D.C., 53 F.Supp. 935; Local No. 6167 v. Jewell Ridge Coal Corp., 4 Cir., 145 F.2d 10; Jewell Ridge Coal Corp. v. Local No. 6167, 325 U.S. 161, 65 S.Ct. 1063, "portal-to-portal" operation was by

agreement only. However, since the Supreme Court's decision, on May 7, 1945, "portal-to-portal" operation, by judicial construction, has become statutory. Defendant has settled its past liability for overtime with its employees as established by the Jewell Ridge decision, and I find no reason whatever to suspect that defendant will not continue to operate on the "portal-to-portal" basis, as it is legally required to do by the Jewell Ridge decision. I therefore find as a fact that there is no reasonable likelihood of violation of the Act in the future by the defendant.

### Conclusions of Law.

 Upon the facts found, I conclude that defendant's foremen and assistant foremen were exempt from the provisions of the Act. I further find that such violations of the Act prior to May 1945 as are attributable to the failure of defendant to operate under the "portal-to-portal" system, cannot be made the basis for an injunction against defendant by the plaintiff, because that question has not been properly raised in this suit, but more particularly, because it would be thoroughly inequitable to base an injunction upon such a failure prior to the determination by the courts in the Jewell Ridge case that "portal-to-portal" was statutory.

However, inasmuch as I have found as a fact that defendant violated the Act in certain particulars, as hereinbefore set out, the question arises as to whether or not, under the provisions of Section 17 of the Act, plaintiff is entitled to the injunction prayed for. When section 17 of the Act provides: "The district courts of the United States * * * shall have jurisdiction, for cause shown, * * * to restrain violations of section 15 of this title.", I do not think that it follows as a matter of course that an injunction must issue in all cases where any violations are proven. I think that the question of whether or not an injunction should issue in a given case is a matter for the sound discretion of the court under all the facts and circumstances of that particular case. Walling v. Young-erman-Reynolds Hardwood Co., 325 U.S. 419-421, 65 S.Ct. 1242, 1250; Hecht & Co. v. Chester Bowles, etc., 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; Walling v. Florida Hardware Co., 5 Cir., 142 F.2d 444; Walling v. Shenandoah-Dives Mining Co., 10 Cir., 134 F.2d 395; Walling v. Buettner & Co., 7 Cir., 133 F.2d 306; Fleming v.

Phipps, D.C.Md., 35 F.Supp. 627; Fleming v. National Bank of Commerce, D.C.S.D. W.Va., 41 F.Supp. 833;

In the exercise of my discretion, I am satisfied that an injunction should not issue. The facts,

(1) that the violations proven are relatively unimportant in view of the number of men employed and the size of the operation,

(2) that no plan or scheme on the part of the defendant to violate the Act has been shown,

(3) that from the effective date of the Act defendant has made a bona fide effort to comply with the Act,

(4) that defendant has promptly taken steps to comply with the Act whenever it had notice of violations,

(5) that defendant is not, and has never been, contumacious,

(6) that all violations ceased not later than November 3, 1943, and that the Act has been in all respects complied with thereafter, and last, but not least,

(7) the fact that I find no likelihood of future violations,

lead me to this conclusion.

Therefore, an order will be entered dismissing plaintiff's complaint.